UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES

v. No. CR 99-024S
3-MC00056

ARTHUR D'AMARIO

MOTION TO MODIFY CONDITIONS OF
PRERELEASE AND SUPERVISED RELEASE

Pursuant to 18 U.S.C. § 3583(e)(2) and Rule 32.1(c)(2)(B), Defendant moves that the court (a) order the Probation Office to cease interferring with the Bureau of Prisons' plan to prerelease him under § 3624(c) in the district of Arizona; (b) assign a probation officer from the Newport or Boston office to supervise him; and (c) strike s.r. Special Conditions Nos. 1 & 4 from the Judgment entered June 10, 2005. For support, Defendant refers the court to his accompanying memorandum and exhibits.

DEFENDANT, pro se,

12-15-05
Arthur D'Amario III 02989-070
U.S. Medical Center
PO Box 4000
Springfield, MO 65801-4000

CERTIFICATION

I certify that on Dec. 16, 2005, I mailed copies of this Motion and Memorandum to Adi Goldstein, 50 Kennedy Plaza, Prov., RI 02903; and to Judge William G. Young, 1 Courthouse Way, Boston, MA 02210, by prepaid mail.

defendant, pro se

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES

v.

No. CR 99-024S
(3-MC-00056)

ARTHUR D'AMARIO

MEMORANDUM

On Nov. 9, 2004, Judge Smith set a new precedent that a defendant's supervised release can be revoked/modified under § 3583(e)(2) before it even commences. U.S. v. D'Amario, 412 F.3d 253 (1st Cir. 2005). This time it's Defendant who initiates the modification process. Several issues now arise.

1. PROBATION IS INTERFERRING WITH PRERELEASE:

Defendant has been told by his BOP case manager, Donna Davis, and by J. Farrar of Inmate Systems Management, that despite his Rhode Island release plan, they maintain "discretion" to place him in prerelease custody in the district of Arizona, which he's asked for. However, on Dec. 14 Miss Davis reported that Probation won't allow Defendant to stay in the Tucson area until he finds housing in Rhode Island.

The court has authority to overrule Probation and to let BOP exercise its discretion to facilitate Defendant's transition to the community.

A Boston halfway house raises numerous logistical problems, such as:

a. Defendant's savings were embezzled in 2004 by Karen Narducci, who left him penniless. He needs the temporary assistance of his parents, who reside in Green Valley, AZ.

b. Defendant has no clothes except 2 pair of jeans, shorts, sneakers, a few short-sleeved shirts, and a windbreaker shell (in Green Valley). His old clothing stored in RI is mildewed. He has no winter clothing and can't afford to buy any to use for 1½ months.

c. Because Judge Smith expelled him from RI in '04, Defendant's car was shipped to Arizona 13 month ago. He doesn't have the $1,000 to send it back to RI, nor does he have an address to send it as he remains homeless.

d. A halfway house in Tucson would quickly refer Defendant into home confinement, enabling him greater access to locate a residence in RI by May '06. With no place to live in RI yet, a Boston halfway house could not offer home detention.

e. Defendant was arrested June 2, 2003, before completion of major dental work in Tucson. Having renewed his credit card last winter, he is planning to finish his dental treatment from the same Tucson doctor in March, before returning home to RI.

f. Placement in Boston does <u>not</u> assist Defendant in accessing his belongings or shopping for an apartment. With no clothes, money or a car, he'd never get out of Massachusetts.

It was the court's decision to force Defendant out west a year ago, and now his several possessions and personal contacts are there. If he released out of ccc from Boston, still with no RI home, where does he go? The BOP sees the logic in sending Defendant to Arizona until he finds a RI apartment and can organize his life. Probation is once again harassing him with senseless, oppressive special rules.

2. A NEW PROBATION OFFICER MUST BE ASSIGNED:

In May 2003, Defendant complied with Judge Irenas' April 30 order and wrote his reasons for returning to RI on paper for Probation. CUSPO Weiner maliciously destroyed the letter, committed perjury June 17, 2003, that Defendant never obeyed the order, then dismissed his protestations as resulting from hallucinations.

On June 8, 2005, USPO Pletcher turned a similar trick, smearing Defendant as a "schizophrenic" to wrangle another harsh sentence.

These officers will not be part of Defendant's future, and if they come near him he'll apply for a Rule 65 restraining order as they pose a threat to him.

Defendant wants nothing to do with the Probation Office or federal courthouse in downtown Providence, which are monoliths to corruption. He insists upon appointment of a new, independent Probation Officer from outside the city, with consultations at a neutral sight like the Marshals office.

Weiner and Pletcher will be hearing from Defendant's Congressman next summer.

3. STRIKING SPECIAL CONDITIONS NOS. 1 & 4:

To the chagrin of every judge who gleefully colluded with the police conspiracy to frame Defendant with anonymous letters mailed to an ex-girlfriend, he has already endured his psychiatric assessment and been cleared. Attached is the BOP report of Dec. 14, 2005, finding that Defendant is not mentally ill and requires no treatment. Also attached is the 2001 similar conclusion of Dr. Weiss, a private psychiatrist appointed by Judge Irenas.

And this opinion of BOP followed a 5-month evaluation, longer than the post-incarceration 4-month examination contemplated by s.r. Special Condition No. 4. This is now a dead issue, and s.r. conditions nos. 1 and 4 serve no purpose. Defendant cannot be "treated" for a mental illness that can't be found. Here is the proof that Dr. Olnes of FMC Rochester counterfeited phony medical records per suggestion of USMS. Olnes has been rebuked by his own BOP colleagues.

The reluctant judges just have to accept that Debra Sellers was the one who needed hospitalization for bipolar disorder. Special conditions are a deprivation of liberty if frivolous and unnecessary. U.S. v. Modena, ___ F.3d ___, ___ (6th Cir. 2002) (striking conditions for drug/alcohol testing where defendant abused neither). Defendant is merely an average guy who hates all judges because the courts are corrupt. He is not budging on this topic. There'll be no more evaluations.

CONCLUSION

*Defendant asks that the requested relief be forthcoming quickly so he can attend ccc in Tucson. He will be back living in RI in time for the May 1 Yankees-Red Sox game. A court preferring more conflicts can simply re-incarcerate him for one month, then get out of his life forever. U.S. v. Tapia-Escalera, 356 F.3d 181 (1st Cir. 2004) (cap in § 3583(e)(3) applies to the aggregate of all time imposed for s.r. violations).

DEFENDANT, pro se,

Arthur D'Amario, III

cc:
AUSA Adi Goldstein

*Should a hearing be necessary, Defendant will only accept as appointed counsel Charles Tamuleviz.

**Name: D'AMARIO, Arthur** **Reg. No. 02989-070** **Date: 12-14-2005**

16. **INSTITUTIONAL ADJUSTMENT:**

A. **PROGRAM PLAN:** Mr. D'Amario was initially designated to the MCFP Springfield for service of his supervised release violation sentence and arrived on July 14, 2005. He was initially classified on July 26, 2005, and it was determined he was a Medium security inmate with In custody. He was programmed to participate in the Institution Release Preparation Program, the Inmate Financial Responsibility Program, voluntary groups, and correctional counseling. His primary goal was to cooperate with a mental health evaluation. He was also encouraged to maintain clear conduct. Mr. D'Amario has been cooperative with staff and has not presented himself as a disciplinary problem as of this writing.

B. **WORK ASSIGNMENTS:** Following completion of the Institution Admission & Orientation Program, Mr. D'Amario was placed on medically unassigned status due to his ongoing mental health evaluation.

C. **EDUCATIONAL/VOCATIONAL PARTICIPATION:** Mr. D'Amario has not completed any educational programs as of this writing.

D. **COUNSELING PROGRAMS:** Mr. D'Amario has not completed any formal counseling programs to date. However, he has received psychological monitoring and counseling on a regular basis. Religious counseling services are available on a voluntary basis. In addition, correctional counseling is available as needed in the correctional setting.

E. **INCIDENT REPORTS:**

None

F. **INSTITUTIONAL MOVEMENT:** Mr. D'Amario was initially designated to the MCFP Springfield, Missouri, for service of his sentence and arrived on July 14, 2005. There has been no further movement to date.

G. **PHYSICAL and MENTAL HEALTH:** Mr. D'Amario was designated to this facility for a psychological evaluation and treatment, if needed. He was subsequently admitted to the Diagnostic & Observation Unit on an outpatient basis where he remains as of this writing. Clinical staff opine he does not require inpatient psychiatric hospitalization or antipsychotic medications as he does not suffer from a major mental illness. He has not exhibited any psychotic symptoms and has been stable since admission. Mr. D'Amario is considered regular duty status with no medical restrictions. He has been cleared for Food Service work.

H. **PROGRESS ON FINANCIAL RESPONSIBILITY PLAN:** On his original sentence, Mr. D'Amario was levied with a Court-ordered special assessment fee of $100 and has an outstanding balance of $50. He is participating in payment of this obligation through the Inmate Financial Responsibility Program.

17. **RELEASE PLANNING:** Upon release from federal custody, as a special condition of supervised release, he is required to reside at the Coolidge House Comprehensive Sanction Center the first four months of his release. Mr. D'Amario previously received Social Security benefits and it is anticipated these will be reinstated upon his release date. He will be encouraged to participate and complete the Institution Release Preparation Program prior to release. As of this writing, he

in this light, the "death threat" implied in the letter should be construed not as the product of a delusional mind, but as a miscalculation of a man trying to manipulate the system. At the time, he did not conceive that the content of the letter would be viewed as anything other than a madman's "rant," and go no further than Mr. Roy's alerting the mental health personnel at Fort Dix. Instead, Mr. Roy shared the information, giving rise to the instant offense. In retrospect, Mr. D'Amario appreciates that he went too far, but he was angry and frustrated.

In summary, although Mr. D'Amario does not have a major mental illness, he has personality characteristics that tend to be offensive to others. These include his being manipulative, confrontational, and dogged ("obsessed") in his pursuit of justice (as he sees it). He has a keen sense of having been wronged by the legal system and having been punished for his efforts to correct it. To a degree, he has created a life filled with litigation, a pattern that was established long before last year. He has a sharp mind for detail and tends to get bogged down in the minutiae of his various cases and appeals. To an observer—even a professional such as Dr. Olnes—this preoccupation can sound "crazy." In this clinician's opinion, the letter in question is merely an example of Mr. D'Amario's using whatever meager weapons are at his disposal to fight back against the larger systems in our society. I do not view Mr. D'Amario as either mentally ill and in need of treatment or a threat to society.

Sincerely yours,

Kenneth J. Weiss, M.D.