UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ARTHUR D'AMARIO III :
: No. CR 99-024
v. : C. ~~A. No. 01-0097~~
:
UNITED STATES :

MEMORANDUM SUPPORTING PETITIONER'S
MOTION FOR RELIEF FROM JUDGMENT

Relying on 45 exhibits, Petitioner is moving under Rule 60(b), clauses (4) and (6), to reopen this § 2255 proceeding and for an evidentiary hearing on his claims that Ed Roy rendered ineffective assistance at the suppression hearing and police violated the Fourth Amendment. Petitioner may utilize Rule 60 for he complains of "some defect in the integrity of the [instant] federal habeas proceedings." Gonzalez v. Crosby, 545 U.S. 524, 532 (2005).

Evidence procured by Petitioner throughout 2007 and '08, primarily with FOIA and the RI Access to Public Records Act, fully supports (a) the bonafide claims pleaded in this initial § 2255 petition; and (b) the allegation he made in his Oct. '05 "motion to vacate judgment" that Judge DiClerico was biased. Typically, he was given no opportunity to prove it. Evaluation of a judge's impartiality tends to be fact-specific. Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (stating that bias or partiality are "flatly prohibited").

*This newly available evidence, particularly Exhibits Nos. 29, 30, 31, 32-37, and 38-44, go beyond the conflicted Judge DiClerico to reveal that:

(a) Judge Lagueux committed a major crime against Petitioner in D'Amario v. Russo, No. 89-cv-0011L (D.R.I.) [718 F.Supp. at 120], by removing his pro se § 1985(2) complaint and replacing it with an old Superior Court photocopy of a tort claim (thereby proving unnatural and grotesque bias already existing ten years before Petitioner's arraignment on this indictment). (EXs 29-31.)

*Clause (2) of Rule 60 is innappplicable, nor are these new claims requiring leave from the Circuit. § 2244(b). This evidence was always known to Petitioner, or the facts were, but 2008 is the first time he's possessed it all together. Dozens of USMS and BOP transfers from '99 to '07 kept separating him from his legal papers, which were usually shipped home or thrown away by the government. The USMS logs were retrieved in 2007-08 through FOIA.

(b) Judge DiClerico acquired Petitioner's Fort Dix "threat" letter in July 2000 from extra-judicial sources, began secretly working with DUSM Steve Bartlett and AUSA Debra Goldklang to maintain Petitioner's custody and to convict him in NJ, and feigned ignorance to remain in the case.

(c) Aware that in March '01 AUSA Browne answered this § 2255 petition by conceding that Petitioner is entitled to "further proceedings" on his fact-dependent claims of ineffective assistance and Fourth Amendment violation, Judge DiClerico denied fair procedure by hastily dismissing the action on May 17, 2001 (EXs 36 & 36A). The conflicted, biased judge knew Petitioner was to be indicted in NJ, with the judge named as "victim," the very next day, May 18 (EX 37). Judge DiClerico did not want to have to recuse and risk the possibility that an impartial replacement judge would hear the claims, overturn the conviction, and let Petitioner out of jail.

(d) The Fort Dix "threat" letter was leaked to the First Circuit in July 2000 by AUSA Lockhart. Rather than recuse, Chief Judge Boudin pretended to be unaffected and personally rejected 100% of Petitioner's criminal and habeas appeals from 2001-08. A year ago, using FOIA, Petitioner obtained various Marshals' logs and fax cover sheets proving that Judge Boudin was illegally divulging Petitioner's "confidential" Judicial Council submissions to AUSA Goldklang in the hope she could use them to convict or have his NJ bail revoked (EXs 38-43). When Petitioner became suspicious, Judge Boudin lied that he'd never received the Judicial Council complaints, and had no knowledge how prosecutors acquired them (EX 44). The Chief Judge is a liar.

The entire Circuit is infested with hateful corruption and dishonesty. It is no wonder that Ed Roy - a RI State Police lawyer in '99 - laid down and made Petitioner the patsy for the anonymous letters amateurish frame-up. (When "AUSA" Roy disclosed Petitioner's attorney-client communications to FBI on 6/27/00, he advised the A-I-C to charge Petitioner with threatening Judge Lagueux, not DiClerico. Later it was learned that on 6/27/00, AUSA Roy was seeking a money-damages judgment from Lagueux, in Menebhi v. Mattos, 183 F.Supp.2d 490 (D.R.I. 2002) (claim filed February 2000).)

Lagueux's conduct of obstructing justice by criminal means in Russo, supra, represents that Petitioner was effectively banished from this corrupt court by 1989.* Venue was improper, a point Ed Roy was afraid to press in '99. Every order entered by Judge DiClerico is a legal nullity. Breach of the duty to recuse codified in 28 U.S.C. § 455(a) requires vacatur of judgment.

*Another kangaroo court, the First Circuit, resorted to the laughable excuse that its Judicial Council was without jurisdiction to investigate Lagueux as his crime was "directly related to the merits." On 3/5/99, Magistrate Martin - another imposter - detained Petitioner as a "risk of flight" on the canard that he'd failed to appear for a misdemeanor pretrial conference in Superior Court in Sept. '86. Martin was aware that Case Scheduling had mailed the '86 notice to attorney John G. Hines, when Petitioner's attorney was John H. Hines. Martin disregarded Petitioner's request that the state file and defective notice be summoned to validate his account of the "mistake." (In reality, the wrong attorney Hines was noticed deliberately when the A.G. tried to sabotage Petitioner's bail.)

Liljeberg v. Health Acquisition Services Corp., 486 U.S. 847 (1988); U.S. v. Antar, 53 F.3d 568 (3d Cir. 1995); U.S. v. Jordan, 49 F.3d 152 (5th Cir. 1995).

Where a judge hears of a threat from extra-judicial sources and steps are taken by USMS and FBI to place him under protection from a party, § 455(a) obligates him to recuse. U.S. v. Cerrella, 529 F.Supp. 1373, 1382 (S.D.Fla. 1982) (postconviction case); U.S. v. Greenspan, 26 F.3d 1001 (10th Cir. 1994).

Recusal of the entire Circuit was actually compelled prior to trial by § 455(b)(1), as Judge Lagueux's crime indicates personal bias.

The denial of impropriety in the face of overwhelming evidence of ex parte contact is very serious. Committee on Judicial Conduct & Disability, 517 F.3d 558, 562 (U.S.Jud.Conf. 2008).

A judgment is obtained by fraud in a judicial system that doesn't provide impartial tribunals or procedures compatible with due process. U.S. v. Small, 333 F.3d 425, 428 (3d Cir. 2003), rev'd on other grounds, 544 U.S. 385 (2005). "An unconstitutionally rendered judgment is void within the meaning of Rule 60(b)(4)." Colunga v. Young, 722 F.Supp. 1479, 1492 (W.D.Mich. 1989), aff'd, 914 F.2d 255 (6th Cir. 1990). Rule 60(b)(4) is not subject to any time limitations. Orner v. Shalala, 30 F.3d 1307, 1310 (10th Cir. 1994).

Judge DiClerico acted in a manner inconsistent with due process when he breached a duty to recuse so he could hastily and unfairly dismiss this case on 5/17/01 because he knew he'd become a prosecution witness on 5/18/01.

With respect to Rule 60(b)(6), the only time requirement is reasonableness, and clause (6) attaches to "extraordinary situation[s]." Klapprott v. U.S., 335 U.S. 601, 613 (1948). It is an extraordinary circumstance that,

1) Petitioner had no meaningful legal representation as Ed Roy hated him, was conflicted, and performed incompetently at the Franks hearing;

2) The evidence (firearm and ammunition) was inadmissible under the Fourth Amendment, as the warrant's executing officers committed the crime described in their affidavit and procured it through judicial deception;

3) Judge DeRobbio, who issued a grossly overbroad search warrant, was not neutral and detached, as he'd been overheard cursing Petitioner 8/30/95;

4) Petitioner pleaded valid and potentially meritorious claims in 2001 but was denied fair procedure by a biased Judge DiClerico (thereby triggering the rule of Crosby, supra, 545 U.S. at 532, that he may invoke Rule 60(b) to reopen the original proceeding without presenting a new "claim");

5) The effect of cumulative errors by the court and Roy, as demonstrated by the exhibits, has resulted in the case having been wrongly decided.

## AN EXAMINATION OF THE EVIDENCE THAT JUDGE DICLERICO AVOIDED:

### I. JUDGE DEROBBIO WAS NOT A NEUTRAL AND DETACHED ISSUING OFFICER.

The Fourth Amendment demands "neutral and detached" quality in one issuing a warrant. Johnson v. U.S., 333 U.S. 10, 14 (1948). The judge must be disinterested. U.S. v. Young, 877 F.2d 1099, 1104 (1st Cir. 1989). He must act independently of the police or prosecution. Shadwick v. Tampa, 407 U.S. 345, 351 (1972). He must not function as a rubber stamp for police. U.S. v. Servance, 394 F.3d 222, 231 (4th Cir. 2005). He must be able to gauge the existence of probable cause by an objective standard. Logue, supra, 103 F.3d at 1044. The good-faith exception to the exclusionary rule is inapplicable where the judge abandons his role and fails to act in a neutral and detached manner. U.S. v. Johnson, 78 F.3d 1258, 1261 (8th Cir.), cert. denied, 519 U.S. 889 (1996).

On 2/8/99, the Garrahy Judicial Complex was filled with dozens of judges and justices of the peace. How convenient for police that Judge DeRobbio chose to review the joke warrant application of Sgt. Collins and Capt. Catlow.

As Petitioner has complained of before - with no opportunity to prove it - an incident occurred at the Powers Building on 8/30/95 which disqualified Judge DeRobbio from consideration of the joke warrant application:

> The JNC held a public hearing 8/30/95 to select a list of 5 finalists to fill a vacancy on the RI Supreme Court. Candidates included attorney Lauren E. Jones and Superior Court Judge Richard J. Israel. Petitioner arrived and signed his name on the list of public speakers, then sat down next to attorneys Norman E. D'Andrea and now-Mayor of Providence David N. Cicilline. Jones was seated behind a group of judges in a different area. As Petitioner signed on, Jones overheard Judges Needham, DeRobbio and Israel, and Administrator John Barrette, cursing Petitioner. Barrette said to the judges, "Arthur D'Amario's here to 'bang' a judge." (Jones related this to Petitioner in the Supreme Court clerk's office 3/7/96.) At that moment, Judges Needham and DeRobbio left their seats and sat down beside Petitioner where Cicilline had been, which Petitioner understood to be an act of intimidation. The JNC called a recess before Petitioner spoke. During the recess, Judge Israel approached Petitioner in a hallway, and apologized for having dismissed a postconviction case, D'AMARIO v. STATE, No. PM 88-4430, a month earlier. Israel said he'd decided the case wrongly and was impressed by Petitioner's performance during trial. Petitioner understood Israel was trying to persuade him to exit the building. Instead, Petitioner stayed and made a speech advocating Jones for the Supreme Court. He was recorded by JNC as public speaker #29. Judge DeRobbio, speaker #6, advocated his lifelong friend, Judge Israel (EX 3). The JNC rejected Israel, and added Jones - Petitioner's favored candidate - to the Final Five list (EX 3). Petitioner's next court appearance was 3/7/96, whereupon Judge Israel, sua sponte, banished him from ever filing "any" pleading in "any" RI court. Israel made no findings, held no hearing, and denied Petitioner leave to appeal the order. Ed Roy was apprised of the JNC incident in Feb. '99 by Petitioner, expressed initial interest in using it to invalidate the search warrant, but never pursued it.

On 12/4/07, Lauren Jones wrote to partially corroborate Petitioner (EX 1). For 9 years, JNC ignored all of Petitioner's public records act requests for its minutes, and RI Attorney General would not process his APRA complaints.

But in Feb. '08, for the first time, the Attorney General acted on the newest complaint and convinced JNC to disclose the 8/30/95 minutes (EX 2). Therefore, this evidence was known to Petitioner in 1999 but unavailable 'til '08.

The JNC minutes and Jones letter are evidentiary support for Petitioner's 2001 claim in this initial § 2255 motion that the Fourth Amendment was violated by Judge DeRobbio's participation. Clearly, Judge DiClerico was in error to hastily dismiss this valid claim without providing Petitioner an opportunity to gather and present proof. The newly available evidence calls for relief pursuant to Rule 60(b)(6).

Another indication that Judge DeRobbio was intent on nailing Petitioner is that he did in fact rubber-stamp the warrant (EX 4). Sgt. Collins tried to be evasive and confusing as to whether the anonymous cards were produced on a typewriter or computer (EX 15), so the judge granted his every wish to maneuver him into small spaces within the apartment. Why were police authorized to search for computer components and hard drives incompatible with a conventional typewriter? Like Judge Israel's bizarre sanctions imposed on 3/7/96, the grant of the warrant by Judge DeRobbio on 2/8/99 was vindictive harassment in retaliation for Petitioner's JNC speech of 8/30/95.

## II. JUDGE ISRAEL MAY HAVE AUTHORED THE ANONYMOUS CARDS.

In private conversation, any RI lawyer will admit that Judge Israel is mentally ill. A Providence Journal article circa 1980-81 quoted Israel as saying his favorite hobby is reading and writing poetry.

The crank greeting cards were not silly, childish limericks, but rather clever, witty poetry (EX 15).

On 8/8/98, the Journal published Petitioner's letter to the editor which poked fun at Judge Jeremiah's ethics scandal (EX 5). Only a month later, Debra Sellers began getting weird, crank letters from RI.* On 9/3/98, the Journal published an article reporting that Sellers had a no-contact order.+

The 8/8/98 letter (EX 5) provided more incentive for the judges to frame

*There are actually at least 3 anonymous letters, but only 2 identified in EX 15. In Sept. '98, Sellers, or Attleboro police, received one saying: "Ha-ha! You'll never catch me. I'll make the Commonwealth pay every dime to get me back to Mass." This forgery was quoted by Asst. DA Chris Markey in his 1/11/99 statement to the MA Bd. of Bar Overseers, but not produced. Markey had mentioned it to Judge Phillips 11/5/98 at an arraignment. No one has ever seen it.

+For 9 years, for reasons unknown, the Journal library has refused to sell a copy of its 9/3/98 article to Petitioner. In early 2005, reporter Tom Mooney claimed to have investigated these crank letters, told Petitioner he's guilty, and then laughed at and insulted him over the phone.

Petitioner with anonymous letters, and the 9/3/98 article alerted them to the fact of his vulnerability. Judge DeRobbio should be questioned as to whether he read the 9/3/98 article in the newspaper prior to 2/8/99.

If Judge Israel wrote the crank letters and gave them to police to deliver to Sellers, it would explain why Ed Roy acted against Petitioner's interests, and why no one has ever seen the letters or why the courts will not permit fingerprint and DNA analyses.

III. MARAUDING POLICE ALREADY KNEW PETITIONER OWNED A FIREARM.

Another unpleasant fact this illegitimate court cannot accept is that the joke warrant was pretextual. Police just wanted a phony excuse from a phony judiciary to forcibly enter Petitioner's apartment so they could find his gun and sabotage his state probation.

From the beginning, rich girl Debra Sellers was being coached by a RI State Police detective - a truth this court finds annoying. At an ex parte hearing in Attleboro 10/21/97, unaware she was being taped, Sellers testified, "A FRIEND OF MINE IS A DETECTIVE IN THE RI POLICE DEPT." (EX 6.) That cop told Sellers Petitioner owned a handgun. In her pro se Defendant Information Form submitted 10/21/97, Sellers wrote of Petitioner's access to firearms, "Posession[sic] of a handgun - years ago!" (EX 7.)

Police may not use a warrant to search for items outside of its scope. U.S. v. 1328 North Main Street, 634 F.Supp. 1069, 1075 (S.D.Ohio 1986).

Of course, this court sees nothing suspicious in the facts that Sellers was working for a state police detective who knew Petitioner had purchased a handgun "years ago." That's why all prior judgments are void. This court continues to be incapable of processing information.

Petitioner is entitled to subpoena Sellers' long-distance telephone records to identify that police detective who knew he owned a firearm.

IV. SELLERS WAS KNOWN BY MARAUDING POLICE TO BE A LIAR.

A warrant can be invalidated on the basis of material omissions in the application process. U.S. v. Vigeant, 176 F.3d 565, 572 (1st Cir. 1999).

Debra Sellers is a habitual liar, and the executing officers knew it but did not disclose it when applying for their joke warrant.

In his libelous affidavit (EX 15), Sgt. Collins declared that Petitioner was "harassing" Sellers with phone calls and unwanted contact. In reality - not that this court is concerned with such a concept - Sellers was harassing Petitioner with a blizzard of false accusations, and police always knew it.*

Upon lying to obtain her civil order, Sellers' TRO was appealed by Petitioner, who was ordered by Judge Dolan to serve the pro se plaintiff a copy by certified mail (EX 8). Not surprisingly, the angry, bipolar rich girl filed a "contact" violation criminal complaint over the Notice of Appeal the minute she received it (EX 9). The warrant for an arrest was sought by Lt. Bussiere (EX 10). (Collins omitted this incident from his Affidavit.)

As with her ex parte testimony of 10/21/97 that her "friend" was a RI cop (EX 6), Sellers was unable to recognize on 10/31/97 that police were recording her words. Exhibiting her hostility and jealousy, she told them:

> "At this time Mrs. Sellers went on to tell [Ptlm.] DuFort that she had dated D'Amario, she said that this was approximately 18 months ago, she said that she only dated this subject twice and never had any problem, and hasn't seen him since. Mrs. Sellers went on to tell DuFort that she broke it off with him 18 months ago and hasn't heard from him until now." DuFort report (EX 9).

Just two days earlier, Sellers had testified that Petitioner was phoning her every night and "harassing" her in an unspecified way.

The fact that police sought a warrant over this basic Rule 5 mail service indicates a police/Sellers collaboration to frame Petitioner. Her no-contact order stated on its face in ¶2 that:

> "You are ordered not to contact the Plaintiff, except . . . for notification of court proceedings . . . Notification of court proceedings is permissible only by mail, or by sheriff or authorized officer when required by statute or [court] rule." M.G.L. c. 209A; EX 11 at p. 2, ¶6.

This outrageous, false arrest was dismissed at the first pretrial conference (EX 11, p. 4, ¶11). Petitioner hired a Boston lawyer and sued Lt. Bussiere, Ptlm. DuFort and Sgt. Collins (EXs 11, 12). He'd eventually settle for a sum of $5,000 (EX 12, DE #39). Collins omitted the arrest without probable cause induced by Sellers from his affidavit (EX 15).

RI Sen. Mike Flynn, sensing what was to come, tried to mediate a resolution to extricate Petitioner from a crooked court system. Flynn wrote a letter to Sellers 7/25/98 (EX 20). How did the rich girl react?

On 7/26/98, Sellers gave the Flynn letter to Sgt. Collins and filed a

*Sellers seemed to become enraged every time she found Petitioner dancing with other women in RI nightclubs, and realized she was not controlling his life. Arrests immediately followed these encounters. The RI clubs were close to where Petitioner lived, but a long trip for the wealthy Sellers.

criminal complaint with Attleboro Police accusing Petitioner of "forgery." The ever-vigilant Collins pretended to take it seriously, and embarrassed the Senator by pursuing a "forgery" investigation.

Collins omitted the "forgery" complaint from EX 15, too.

On 2/4/99, Sellers appeared in court to extend her no-contact order, and Lt. Bussiere attended. Cross-examined for the first time, Sellers testified that Petitioner hadn't phoned her in '99, or in '98, or in '97. She added that Bristol County DA Markey had brought false charges against Petitioner in 1998.

Neither Bussiere nor Collins divulged that testimony to Judge DeRobbio. By 2/8/99, both make-believe policemen knew Debra Sellers was a perjurer who was abusing judicial processes to ruin Petitioner's life in a jealous fit.

(This ridiculous court finds nothing remotely suspicious.)

V. <u>BUSSIERE AND COLLINS SEEK REVENGE FOR THE CIVIL SUIT</u>.

A constable served Bussiere, Collins and DuFort with Petitioner's civil summons on 7/28/98 (EX 12, DE #4). How did Bussiere take it?

The same day, 7/28/98, Lt. Bussiere typed and signed a request addressed to the Attleboro court clerk to inspect the Sellers file, No. 9734 RO 0752.* Obviously, he learned that her no-contact order was active. Second, if he didn't already know, he'd have seen EX 7 and discovered that Petitioner may still own a handgun purchased "years ago." Sellers would begin receiving anonymous letters with RI postmarks about a month later.

Police would strike after Sellers got their Happy Birthday card to her. They made plenty of mistakes. Sgt. Collins reported that "[t]oday," Jan. <u>15</u>, Sellers received the card by mail (EX 13), and for that reason Petitioner is a probation violator (EX 15). Lt. Bussiere and PO Jeff Wordell served Petitioner a summons to appear in court for a violation hearing (EX 14). Wordell typed on the summons: "DATE OF ISSUE 1/14/99." Incredibly, they issued a summons on Jan. <u>14</u> over a "crime" reported on Jan. <u>15</u>! This astounding evidence alone would crack the case if this was a legitimate court of law.

*In late '98, Petitioner made a copy of Bussiere's 7/28/98 request to inspect the civil file, which is in storage in RI. In 2002, he wrote to the clerk to ask for another copy of it. The clerk-magistrate, Dan Sullivan, wrote back lying that "there was no request for information filed in this matter, by Lt. Bussiere." Either Sullivan was lying to protect police, or else Bussiere had returned to remove and destroy the document to cover his tracks after the 2/8/99 raid on Petitioner's apartment.

VI. THE WARRANT WAS PROCURED BY JUDICIAL DECEPTION.

As previously stated, police tried to confuse Judge DeRobbio about whether the crank letters were produced on a typewriter or computer device. Seeing no contradiction or ambiguity, DeRobbio happily rubber-stamped the application (EX 4). Judge DiClerico, exposed now as a judicial fraud and a sneak, rescued the marauders by asserting that once they'd confiscated Petitioner's irrelevant Smith Corona, they had to continue the search for "computer hard drives" to exhaust the warrant. (Order of 11/3/99 denying Petitioner's motion to suppress, #CR 99-024.) Judge DiClerico is a faker who can't see straight - a biased, corrupt and dishonest fraud of a judge.

The confusion ends here, today. The mystery letters were typewritten, not computer generated, and marauding police knew it on 2/8/99.

The initial Incident Report of Sgt. Collins states that the letters were "addressed with a typewriter and typed[.]" (EX 13.)

Capt. Catlow's own report of 2/8/99 said Sgt. Collins told him Petitioner is "typing letters" to Sellers (EX 16). Collins told Catlow of a desire to seize a typewriter, not a computer (EX 16).

Disgraced ex-FBI document expert Alan Robillard would find the letters were typed (EX 17), and not from a Smith Corona.

On 5/18/99, Robillard met with "AUSA" Ed Roy - the State Police lawyer. Roy's internal memo of 5/20/99 quotes Robillard as telling him that,

> "Collins was concerned chiefly with typewriting and in fact had identified the card as having typewriting on it. He did not mention a computer or bubblejet printer type of printing. He was concerned with typewriting." (EX 18.)

Roy did not bring that out on his direct questioning of Robillard 10/21/99.

The anonymous letters were typed. Even if by some stretch of the imagination probable cause existed to apply for a warrant, then the scope of the warrant had to be limited to seizure of the Smith Corona. On 10/21/99, Sgt. Collins testified that his pressed an intrusive search of the bedroom closet and dresser drawers for "15 minutes" after seizure of the typewriter.

Collins also used deception by lying that Petitioner's typeset was "similar" to that on the anonymous letters (EX 15). Robillard found no similarity (EX 17). Where police lied in a warrant application that nails used in a bomb were identical to those kept in a suspect's home, when they weren't even similar, the warrant was invalid and police were liable in tort.

Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1292 n.14 (9th Cir. 1999) (denying police qualified immunity in § 1983 cause).

Sgt. Collins didn't stop there. He lied repeatedly. In his report (EX 13) and affidavit (EX 15), Collins claimed that the cards had been processed by MA State Police and found to contain no fingerprints.

But on 11/3/06, MA State Police confessed to Petitioner that they've "no records" of fingerprint testing (EX 19). Either of two things occurred:

- Fingerprint analysis was consciously evaded so that Bussiere could not be implicated as the author, forcing Collins to lie about it; or

- Fingerprints of someone other than Petitioner were found, and by 11/3/06 all records had been destroyed to prejudice Petitioner.

Perhaps police knew Petitioner would be hailed into a clown court that cannot understand anything. The judges of this court would disagree that the grass is green unless assured by a government agent.

It is clearly established that lying to an officer to procure a warrant is unlawful. Hampton v. Oktibbeha County Sheriff Dept., 480 F.3d 358, 364 (5th Cir. 2007). "A seizure conducted pursuant to a warrant obtained by judicial deception violates the Fourth Amendment." Whitaker v. Garcetti, 486 F.3d 572, 581 (9th Cir. 2007) (no qualified immunity for policemen who "falsified an affidavit for the warrant application").

A suspect was convicted of threatening a member of Congress when FBI found his palmprint on an unsigned death threat letter. U.S. v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996). A government fingerprint technician identified a fingerprint found on a threat letter mailed from prison to a state prosecutor. U.S. v. Slaughter, 116 F.Supp.2d 688, 691 n.4 (W.D.Va. 2000). Threats mailed to a court by an inmate contained his fingerprints on the letters and envelopes. U.S. v. Lincoln, 589 F.2d 379, 380 (8th Cir. 1979); see also U.S. v. Polson, 154 F.Supp.2d 1230, 1232 (S.D.Ohio 2001) (Secret Service uncovered two latent fingerprints on anonymous threat letter and matched them with defendant's prints in FBI database).

Here, we're supposed to believe a store clerk placed the cards on a shelf, a customer purchased them, a cashier rang them up, the author typed on them and mailed them, numerous postal personnel handled them, and Debra Sellers pulled them from her mailbox (likely showing them to her parents),

all without a single print being deposited. Only a fool - an imposter - such as Judge DiClerico would fall for such a corny magic trick. Regardless, the new evidence (EX 19) shows that the cards were not examined for prints. The warrant was obtained through trickery and deceit.

VII. ALAN ROBILLARD HAD A CONFLICT THAT AFFECTED HIS JUDGMENT.

Petitioner has standing by a certified, objective ex-FBI document expert anxious to examine the anonymous letters and compare them to Lt. Bussiere's typeset on EX 14. See EX 22. The new expert disputes Robillard's contention that he had to have Petitioner's Smith Corona to determine if the anonymous cards came from it. Robillard gave odd testimony 10/21/99, acknowledging that Collins approached him about typewriting and that he asked Collins to seize computers, bubblejet printers, etc., "to touch all the bases." Robillard defended Collins 10/21/99, even after telling Roy (EX 18) there was no probable cause to apply for the warrant. None of this makes sense.

In 1996, FBI SA Fred Whitehurst implicated Robillard on CNN as being involved in sloppy, disingenuous practices at the crime lab where tests were administered in a biased manner to assist prosecutors.

In his 8/31/99 letter to Petitioner, Robillard admitted he is under contract to the people who framed him (EX 21). Rather than submit the evidence to an impartial expert, Ed Roy relied on the confusing, conflicted Robillard. Whether an expert witness is biased toward a party is a relevant issue. U.S. v. Abrams, 427 F.2d 86, 90 (2d Cir.), cert. denied, 400 U.S. 832 (1970):

> "The existence of bias or prejudice of one who has expressed an expert opinion can always be examined into on the cross-examination of such expert; as well as the facts upon which his expert opinion was based."

U.S. v. Preciado-Gomez, 529 F.2d 935, 942 (9th Cir.), cert. denied, 425 U.S. 953 (1976).

Typeset cannot be "similar" as asserted by Collins (EX 15):

> "Expert testimony as to questions of the authenticity of typewritten documents falls into two categories: the identification of the writer who uses a particular machine, and the identification of the machine on which the document was written. For the purposes of authenticating typewritten documents, the courts have recognized for some time that the individuality of a typewriter and its operator are as distinctive as handwriting."

31A Am Jur 2d § 138, p. 159 (2002) Expert and Opinion Evidence.

The distinctive individuality of the anonymous cards would have been known to Robillard, had he conducted a pre-search investigation. A typewriter's unique characters are identifiable in the FBI's "comprehensive collection of typewriter standards available to a document examiner." O'Ferrell v. U.S., 32 F.Supp.2d 1293, 1303 (M.D.Ala. 1998), aff'd, 253 F.3d 1257, 1270 (11th Cir. 2001).

In O'Ferrell, the FBI's document experts matched the typeset on pro se court pleadings to the typewriter that produced anonymous death threats. Id., 32 F.Supp.2d at 1300. According to those adjudicated facts, Robillard had the ability to consult his typewriter standards file prior to 2/8/99 and determine that the Sellers greeting cards did not come from the machine that produced Petitioner's "K2" samples (EX 17). Robillard was deceptive, straining his imagination to assist marauding police who employ him.

And Ed Roy failed to properly certify Robillard as a qualified expert. Roy only established on 10/21/99 that Robillard is a document expert who worked for FBI. That's not enough.

A document expert is qualified when he submits to proficiency tests twice a year, and all his work is reviewed and confirmed by at least one other document examiner. U.S. v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002). The examiners generally are certified by the American Board of Forensic Document Examiners. Id.

Whether Robillard meets these criteria is unknown. Certainly, and curiously, he did not have his opinion to Collins - that the Smith Corona must be seized - reviewed by at least one other examiner. A second examiner who is suspicious of Robillard's dubious opinion wants to examine the cards himself (EX 22). That new expert is questioning Robillard's key holding that the typewriter had to be seized prior to an examination of the cards. Robillard is undermined by O'Ferrell.

The above authorities provide one conclusion: Robillard had the means to compare both anonymous cards to Petitioner's "K2" court pleadings. He'd have determined they did not match and the Smith Corona was irrelevant. Upon consulting his FBI typewriter standards file, he'd have known the greeting cards had no characters unique to Smith Corona. This work that he didn't do would have then been corroborated by a second examiner, all prior to 2/8/99.

Then again, maybe these routine procedures apply to every citizen except

the unpopular Petitioner.

VIII. THIS BIASED COURT HAS MISAPPLIED FOURTH AMENDMENT JURISPRUDENCE.

One of the many pranks this court pulled on Petitioner was the grotesque mishmash of the law handed up by a smirking Judge DiClerico 11/3/99. Contrary to that decision denying the motion to suppress, Fourth Amendment law clearly states that,

1) Execution of a search warrant may not be pretextual;
2) Police may only take that which is authorized pursuant to the warrant;
3) The search's scope is limited by the terms of the warrant's authorization; and
4) Evidence not described in a warrant may be seized if it has a nexus with the crime under investigation.

Judge DiClerico enunciated those basic, universal rules in U.S. v. Cardiges, 881 F.Supp. 717, 723-24 (D.N.H. 1995) (conceding that a warrant must be valid). He did not apply his own substantive law, as the judge is a biased fraud.

These 45 exhibits prove the following hard facts:

1) The phony warrant was a pretext to access the firearm that Sellers knew Petitioner owned back in 1997 (EX 7);
2) Police seized the Smith Corona immediately upon entering, then continued a general rummaging of the bedroom for "15 minutes" (10/21/99 TR of Collins' testimony);
3) Even if police did not type the crank letters themselves, the search would have had to have been limited to seizure of typewriters, not "hard drives," as police always knew the anonymous cards were created by a typewriter (EXs 13, 15, 16, 17, 18);
4) The firearm, which was not even in plain view, U.S. v. Paradis, 351 F.3d at 30-32, had "no nexus" to the crime under investigation.

On these newly documented facts - several of which were record facts on Oct. 21, 1999, Cardiges compels a finding of a Fourth Amendment violation. ""Simple justice" is achieved when a complex body of law developed over a period of years is evenhandedly applied." Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 401 (1981).

Paradis suppressed a handgun because police moved clothing to expose it. Officers entered a dwelling without a warrant, used their foot to move a duffle

bag, which exposed a gun. The plain view exception was inapplicable and the contraband suppressed. U.S. v. Thomas, 190 F.Supp.2d 49, 56-57 (D.Me. 2002). Cash wrapped in aluminum foil in a freezer was concealed and not in plain view. U.S. v. Gonzalez Athehorta, 729 F.Supp. 248, 259-60 & n.5 (E.D.N.Y. 1990) (package in freezer had to be removed and unwrapped before officers could determine if it was evidence of drug activity).

The 10/21/99 evidentiary record only shows that Sgt. Collins found the firearm in the bedroom dresser. A disinterested Ed Roy failed to establish the crucial fact material to Paradis, 351 F.3d at 30-32, that police had to move clothing inside the drawer to reveal the handgun. Prejudice from ineffective assistance can be grounded in the failure of an attorney to litigate a meritorious Fourth Amendment claim that would have excluded the evidence. U.S. v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990). A pretrial suppression hearing is a critical stage at which the right to effective assistance of counsel attaches. Henderson v. Frank, 155 F.3d 159, 166 (3d Cir. 1998).

The supposed "crime" named in the warrant application (EX 17) would have been a nonviolent misdemeanor. M.G.L. c. 209A. The authority of officers to approach a house under a misdemeanor arrest warrant does not extend to a warrantless and unreasonable search of the house. U.S. v. Reynolds, 526 F.Supp.2d 1330, 1342 (N.D.Ga. 2007).

A search warrant was invalidated in part because a detective omitted information that the wife of defendant who supplied information to police was romantically involved with a city police officer. U.S. v. Cowdin, 984 F.Supp. 1374, 1377 (D.Kan. 1997). This is akin to Petitioner's proof that Sellers had a "friend" in Ed Roy's RI State Police (EX 6).

A general description of property to be seized imposes too much discretion on an agent. U.S. v. Smith, 23 F.2d 929, 930 (1st Cir. 1928). Here, police confused Judge DeRobbio as to which kind of machine may have produced the cards. No basis existed for trying to seize "computer components" (EX 18).

Police executing a search warrant found the item named in their warrant on the floor of a closet. They continued to look for and seized evidence of the same crime beneath a mattress. The evidence under the mattress had to be suppressed. U.S. v. Highfill, 334 F.Supp. 700, 701 (E.D.Ark. 1971). The court went on to say that,

> it "has no doubt that items discovered in a search continued after the described items have been found must be suppressed. The very fact that the search continued after discovery of the item described indicates that the search had a further objective." Id., at 702.

After seizing the irrelevant Smith Corona from the kitchen table, Sgt. Collins pressed the 15-minute rummaging of the bedroom (looking for the gun). The intrusion must be justified by probable cause. U.S. v. Micheli, 487 F.2d 429, 432 (1st Cir. 1973). "Furthermore, any searches which are deemed necessary should be as limited as possible." Id.

Police had a warrant to search for stolen clothing. Four detectives were admittedly looking for narcotics during the search. They found a revolver that led to a felon-in-possession conviction. The court suppressed the gun. U.S. v. Tranquillo, 330 F.Supp. 871 (M.D.Fla. 1971). "They were hunting for any evidence of wrongdoing they could find." Id., at 876.

To investigate an arson suspect, police obtained a warrant to search his home for gambling paraphernalia, which was subterfuge and a pretext for seeking arson evidence. The search and seizure of arson evidence without a warrant was unreasonable. U.S. v. Belcher, 577 F.Supp. 1241, 1247 (E.D.Va. 1983). The motion to suppress was granted. Id., at 1257.

Since police could have obtained a search warrant for evidence whose discovery they fully anticipated, a warrantless search beyond a scope necessary to effect an arrest, and a search warrant based on plain view observations of police during the search, were invalid. U.S. v. D'Alo, 486 F.Supp. 945, 953 (D.R.I. 1979). Police knew of a slug-making crime when effecting an arrest for theft of a truck. They used the arrest warrant to observe evidence of slug-making operations. Id. An arrest may not be used as a pretext to search for evidence. Id. at 949. "This Court is greatly distressed by the opportunism displayed by the Warwick and State Police in this case." Id. at 953. (See also Terrell v. Petrie, 763 F.Supp. 1342, 1345-46 (E.D.Va. 1991), for an analysis of cases and law reviews on pretextual warrants.)

Likewise, here it was "opportunis[tic]" for police to learn from Sellers that Petitioner owns a firearm, then come into receipt of anonymous letters with RI postmarks leading them right to it. Some cops are just lucky.

As aforestated, the marauding police didn't know Petitioner had a felony record on 2/8/99, and thus told Prof. Horwitz the gun is legal (EX 28). The

incriminating character of the contraband must be immediately apparent to police, otherwise it must be suppressed. Arizona v. Hicks, 480 U.S. 321 (1987) (where executing officers had to move stereo to find serial numbers, and post-seizure investigation revealed that stereo was stolen, evidence had to be suppressed); U.S. v. Szymoniak, 727 F.2d 95, 98 (6th Cir. 1984) (police had to confer with firearms expert to determine if rifle was illegal; seizure violated Fourth Amendment):

> "We reject the government's suggestion that a police officer with no knowledge of a citizen's criminal history may constitutionally seize firearms or ammunition without a warrant, so long as the citizen turns out to be, in hindsight, a convicted felon."

U.S. v. Blom, 242 F.3d 799, 808 (8th Cir.), cert. denied, 534 U.S. 880 (2001).

A claim of unconstitutional search and seizure is cognizable in a § 2255 proceeding. Baranski v. U.S., 515 F.3d 857, 860 (8th Cir. 2008).

Finally, as proven by EXs 17 and 19, marauding police avoided pre-search fingerprint and DNA testing that would have identified the author, when that is the very nature of a detective's job.

An innocent suspect was arrested without probable cause where an officer withheld from a warrant affiant exculpatory DNA analysis, resulting in its omission. The officer's defense of qualified immunity to a § 1983 claim was denied, and his grant of summary judgment reversed. Burke v. Town of Walpole, 405 F.3d 66, 84 (1st Cir. 2005).

The withholding of exculpatory DNA findings in Burke is no different than here, where police departed from normal procedures to stymie their own "investigation" so as not to inculpate Lt. Bussiere. Fingerprints retrieved from anonymous letters regularly solve crimes. U.S. v. Myers, 503 F.3d 676, 680 (8th Cir. 2007) (defendant's prints on threat letters to court clerk); U.S. v. Lincoln, 589 F.2d 379, 380 (8th Cir. 1979) (death threats mailed to court had inmate's prints on letters and envelopes); U.S. v. Polson, 154 F.Supp.2d 1230, 1232 (S.D.Ohio 2001) (Secret Service uncovered two latent fingerprints on an anonymous threat letter and matched them with defendant's prints in FBI database).

A district court may order assistance of an adequate fingerprint expert if a defendant has a "plausible defense." U.S. v. Smith, 502 F.3d 680, 686 (7th Cir. 2007) (appointed expert found defendant's thumb print on a bag inside a bomb and he was justly convicted).

To feign probable cause, this disreputable court, which only reverses convictions of Mob hitmen, ignored all of these facts, misinterpreted the law, distorted Petitioner's theories for relief and denied fair procedure. Lacking a single day of discovery or subpoena power, and from his jail cell, Petitioner has produced 45 exhibits invalidating both the warrant and this court's oddball judgments.

IX. THIS MOTION MUST BE REASSIGNED TO ANOTHER CIRCUIT.

On 11/29/01 at Camden, NJ, DUSM Bartlett testified that in summer 2000, a year before this § 2255 proceeding was commenced, Judge DiClerico considered his safety - even at home - to be threatened by Petitioner and asked USMS to "track" his movements (EX 35). As already demonstrated, back in 1989, Judge Lagueux removed Petitioner's civil § 1985(2) complaint from the file in No. 89-cv-0011L and replaced it with a counterfeit (EXs 29-31). Chief Judge Boudin is a proven liar and a member of the NJ prosecution team (EXs 38-44). The RI judiciary has a grudge against Petitioner for successfully opposing Judge Israel's bid for RI Supreme Court (EX 1), and for having a series of letters published in Providence Journal scoffing the bad judges (EX 5). In a brazen act of monstrous judicial fraud, by a fraud, Judge DiClerico quickly dismissed this action 5/17/01 (EX 36A), to beat the NJ indictment by a day (EX 37).

This Rule 60 motion cannot be fairly adjudicated by an obviously crooked group of cronies who belong in the ACI. Fraud is where the court or a member is corrupted or influenced or where a judge has not performed his judicial function. Switzer v. Coan, 261 F.3d 985, 988 (10th Cir. 2001).

"[T]he public spirited and thoroughly impartial judge does not want innocent men to be convicted." Figueroa Ruiz v. Delgado, 359 F.2d 718, 720 (1st Cir. 1966).

Would a reasonable, objective person believe that Judge DiClerico and CJ Boudin wish to see justice done and the warrant invalidated? The statute, § 455, applies to Courts of Appeals, too. Pilla v. American Bar Assn., 542 F.2d 56, 58 (8th Cir. 1976). No lawyer could represent Petitioner within the Circuit for he'd be intimidated by the judges' bias, which could hinder his performance. Tejeda v. DuBois, 142 F.3d 18 (1st Cir. 1998) (counsel's fear of trial judge required reversal of order denying § 2254 writ).

Plus, these Circuit judges have promised Ed Roy a RI judgeship - a fact he disclosed to client Arthur Jordan in early 2005.

The entire First Circuit is required to recuse.

X. THE EFFECT OF CUMULATIVE ERRORS REQUIRES A NEW TRIAL.

Cumulative error can warrant reversal regardless that no individual error warranted reversal. State v. Jenewicz, 193 N.J. 440, 473, 940 A.2d 269, 289 (2008). "The thematic effect of those errors requires that they be evaluated cumulatively." Id. at 474, 940 A.2d at 289. A postconviction court may consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced. Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005). "We note that in the context of a criminal trial, an accumulation of errors can likewise be grounds for a new trial." Latiolais v. Whitley, 93 F.3d 205, 210 n.7 (5th Cir. 1996).

Virtually none of this evidence was procured in 1999 by Ed Roy. The case was not defended. How many mistakes are enough?

XI. THE COURT MUST TAKE EVIDENCE CONCERNING ED ROY'S CONFLICT.

As EX 21 demonstrates, by July '99 Petitioner and Ed Roy were divided.

A felon-in-possession conviction was set aside over a denial of a continuance to allow a defendant to retain counsel, based on differences with appointed counsel. U.S. v. Prochilo, 187 F.3d 221 (1st Cir. 1999) (abuse of discretion for district court to deny new counsel without any inquiry or findings). This is why Petitioner may invoke Rule 60(b) to complain of unfair and improper procedures. In both the criminal case, No. CR 99-024, and the instant matter, he never had a hearing on this issue.

There is a Sixth Amendment right to an attorney's undivided loyalty free of conflicts of interest. U.S. v. Arnold, 913 F.Supp. 348, 350 (E.D. Pa. 1995) (attorney disqualified where defendant refused to waive conflict).

Ed Roy's hostility toward Petitioner caused him to meet only 3 times with his client, over 16 months, and that was ineffective assistance in Vasquez v. Bradshaw, 522 F.Supp.2d 900, 925 (N.D.Ohio 2007) (breached duty to learn as much as he could from prosecutor, defendant and other witnesses about additional allegations against client).

There is plenty of evidence that Roy hated Petitioner prior to being assigned 5/5/99. Petitioner, having made the requisite allegations in his § 2255 motion, is entitled to try to prove it in an evidentiary hearing.

The split between Petitioner and AUSA Roy started with Roy's absurd § 4241(a) motion of 4/30/99, a sleazy, unethical tactic designed to stash Petitioner far away because Roy wasn't ready for the 5/11/99 suppression hearing. Petitioner would not agree to a continuance. Roy maliciously prosecuted Petitioner with the baseless : 4241 motion, having recently obtained a glowing competency report from Dr. Alan B. Feinstein of ACI on 3/9/99 (EX 25). FCI Butner also found no competency question. See U.S. v. D'Amario, 2 Fed.Appx. 25, __ (1st Cir. 2001) (noting that Petitioner passed his § 4241 exam).

Tensions increased throughout 1999 as AUSA Roy strangely refused to ever provide his client with copies of the anonymous greeting cards. Roy was still offering lame excuses for not divulging the cards well into 2000 (EX 24).

As if to provoke and agitate Petitioner, AUSA Roy wouldn't even share the anonymous cards with Petitioner's private investigator (EX 23). One would expect such obstructive maneuvers from an Attorney General, not the "defense" attorney of record.

Fed up with Roy's weird behavior and secrecy, by July '99 Petitioner had tried to enter his appearance pro se for the third time (EX 26). Judge DiClerico, delighted to see the defense self-destruct, didn't even hold a hearing inquiring into the conflict.

Prof. Andrew Horwitz would have been a valuable defense witness at the Franks faux hearing of 10/21/99. During the search, and minutes after Sgt. Collins seized the firearm, Capt. Catlow told Horwitz over the phone that no arrest was being made because the gun is legal under RI law (EX 28). Can AUSA Ed Roy, the judges' darling, excuse his failure to call Horwitz?

Included as EX 27 is a memo that was faxed to Roy in late Feb. '99 by Susan Petit, Petitioner's girlfriend. Petit wrote to Roy, "You may also contact Andy Horwitz regarding this case - 276-4880. Please contact Andy." (EX 27.) Roy knew prior to indictment that Prof. Horwitz had talked to Catlow, and didn't even bother to interview him. How can a court expect Petitioner to maintain cordial relations with such a terrible "defense" lawyer? Whether the relationship broke down in early '99 is a factual matter that cannot be summarily dismissed.

XII. CHIEF JUDGE BOUDIN IS LYING AGAIN.

As Petitioner completed this Brief, he received another letter from CJ Boudin, tagged as EX 46. On 5/5/08, CJ Boudin again lied that he did not receive, and did not leak to prosecutors, Petitioner's Judicial Council complaints of Nov. 2001 (EXs 38 and 39). All Petitioner had sent Boudin was the USMS cover sheets (EXs 41 and 42).

The Chief Judge was unaware on 5/5/08 that Petitioner also possessed DUSM Bartlett's personal logs from Nov. '01 and 12/6/01 (EXs 43 and 44). Bartlett wrote in Nov. '01: "Received info from Chief [Marshal] re: letter received by 1st Circuit Appeals Judge Boudin in chambers from D'AMARIO." (EX 43.) On 12/6/01, Bartlett wrote: "Received letter by fed-ex from 1st Circuit court of appeals in Boston."

Chief Judge Boudin, like Sellers, is a habitual liar unfit for office. He has outrageously lied twice in writing. This case is structurally defective.

CONCLUSION

Petitioner has shown cause for reopening the judgment so that he may prove his claims of illegal search/seizure and ineffective assistance, and has appropriately implemented Rule 60(b).

The motion must be referred to a judge from without the Circuit, as Judges DiClerico and Boudin are members of the NJ prosecution team who've been lying to cover up their involvement with the executive branch. More seriously, in 1989, Judge Lagueux committed the crime of obstruction of justice in Russo. In the wake of such a horrific act, no such party could ever receive a fair hearing in the same court.

Even absent a hearing, Petitioner's exhibits would convince any impartial mind that executing officers wrote the anonymous letters themselves to locate the little gun, and that "AUSA" Roy presented no challenge.

PETITIONER, pro se,

[signature] 5-13-08

Arthur D'Amario, III

cc:
AUSA Adi Goldstein
50 Kennedy Plaza
Prov., RI 02903